IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DOUGLAS K. KARPF                          :
                                         :        CIVIL ACTION
        v.                               :
                                         :        NO. 10-1401
MASSACHUSETTS MUTUAL LIFE                :
INSURANCE COMPANY, ET AL.                :


**MEMORANDUM**

**SURRICK, J.**                                    **FEBRUARY  28 , 2018**

Presently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 76.)
For the following reasons, the Motion will be granted in part and denied in part.

# I.      BACKGROUND

This action arises from a business dispute that ensued when an insurance agent with a

substantial book of business transferred from one insurance agency to another.

## A.      Factual Background[1]

### 1.      History of the Parties' Relationship

Plaintiff Douglas Karpf sold insurance policies for Massachusetts Mutual Life Insurance

Company ("MassMutual") for nearly three decades.  (Karpf Dep. 46, Defs.' SJ Br. Ex. 2, ECF

No. 76-1.)  MassMutual's insurance products are sold throughout the United States by individual

agents, also referred to as producers or advisors, who work under the auspices and direction of

general agents and their respective agencies.  (Fishman Dep. 10, Defs.' SJ Br. Ex. 11.)

During the time period relevant to this dispute, Plaintiff was a full-time agent with First

Financial Group ("First Financial"), a MassMutual general agency operated by Defendant Harris

---

[1] We view of all of the facts and draw all reasonable inferences therefrom in the light
most favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848,
852 (3d Cir. 2006).

S. Fishman ("Fishman"), MassMutual's general agent for the territory comprised of Pennsylvania, New Jersey and Delaware.[2] (*Id.*)  First Financial's agency identifier within MassMutual is "A074."  (Kupersmith Dep. 62, Defs.' SJ Br. Ex. 19.)  First Financial's main office is in Bala Cynwyd, Pennsylvania, and it has satellite offices in downtown Philadelphia, New Jersey, and Delaware.  (*Id.* at 14.)  MassMutual's home office is in Massachusetts. (Fishman Dep. 11.)  Throughout Plaintiff's tenure with First Financial, he worked out of satellite offices located in New Jersey, but he came to First Financial's Bala Cynwyd main office regularly—as often as several times per month—to attend meetings and training and to submit policy applications and premium payments.  (*Id.* 52-53; Karpf Dep. 16-17.)  All the paperwork for the policies that Plaintiff handled was submitted to First Financial's Bala Cynwyd office. (Karpf Dep. 16-17.)

Plaintiff and Fishman memorialized the terms of Plaintiff's role as a full-time agent with Fishman and First Financial in a MassMutual document, the "Career Contract For Full-time Agents" (the "Career Contract" or "Agreement"), executed on January 3, 2003.  (Career Contract, Defs.' SJ Br. Ex. 3.)  MassMutual approved the Career Contract, but it was not a party to the Agreement.  (*Id.*)  The Career Contract's provisions detail Plaintiff's duties and authority, and the parties' arrangements regarding Plaintiff's compensation.  (*Id.* at 1-2.)  The Agreement grants Plaintiff authority to solicit applications from anyone living in First Financial's territory or from any MassMutual client who already had "business" with Fishman.  (*Id.* at 1.)  The Career Contract contemplates limitations on Plaintiff's authority.  For example, under the Agreement, Plaintiff is not permitted to provide his clients with MassMutual policies without first receiving payment of the initial premium.  (*Id.*)

---

[2] Plaintiff's claims against First Financial Group are solely based on a theory of vicarious liability, which Defendants have not disputed.

With respect to compensation, Plaintiff is entitled to three different types of commission: "first-year commission," "renewal commission," and "renewal service commission." (*Id.* at 2; Karpf Dep. 22.) First-year commissions—which afford agents the most compensation—are earned when new policyholders pay their first-year premiums. (Karpf Dep. 23; Fishman Dep. 64.) Agents earn renewal commissions each time an existing policy is renewed. (Karpf Dep. 23-24; Fishman Dep. 64-65.) The form of commission to which an agent is entitled is determined by, *inter alia*, the agent's role with respect to the corresponding policies. (Karpf Dep. 22-26.) For example, the agent who initially writes and sells the policy is the "writing" agent and receives a first-year commission as well as renewal commissions if the policy is renewed. A policy's "servicing" agent, who does not receive first-year commissions, but may receive renewal commissions, is the agent who provides a policy holder with ongoing customer service. (Ranck Dep. 24, Defs.' SJ Br. Ex. 17; Fishman Dep. 129-30.) Often, an agent performs both roles with respect to a policy—referred to as a "writing and servicing" agent. (Fishman Dep. 129-30; Kupersmith Dep. 110.) In some instances, multiple agents may work together to jointly write a policy and share commissions pursuant to an agreed upon percentage split. (Pugh Dep. 51-52, Defs.' SJ Br. Ex. 14.) Although agents could share business in this fashion, it appears that MassMutual's written communications to policyholder clients only identify the designated writing and servicing agent. (Brattelli Dep. 34-35, 49-50, Defs.' SJ Br. Ex. 26.)

The Career Contract's compensation structure also permits Plaintiff to collect additional payments when he has met annual commission goals. (Career Contract 2.) The Agreement includes an "Active Persistence Fee" provision, which establishes that Plaintiff is entitled to collect the fee during his period of service. (*Id.*) According to Fishman, "the persistency fee is an incentive program . . . [that] compensate[s] agents for doing quality business." (Fishman Dep.

65.)  Plaintiff is also entitled to receive certain compensation after termination of the Career Contract.  Under the terms of the Agreement, when termination is not caused by death, Plaintiff may continue to collect first-year commissions in addition to any "basic vested renewal commissions."  (Career Contract 2.)  Persistency fees, on the other hand, may be collected after the Agreement's termination only if Plaintiff's service under the Agreement ceases as a result of retirement.  (*Id.*)

During his tenure as an agent with Fishman and First Financial, Plaintiff was a top producer for the agency.  According to Fishman, Plaintiff "had the most clients and wrote the most policies," and he was a "perennial qualifier" for the "leader's conference," a MassMutual recognition program for agents who earn a high level of commissions.  (Fishman Dep. 69, 95.)

       2.     *The Parties' Dispute*

Plaintiff's Career Contract with First Financial terminated in April 2008.  (Karpf Dep. 89-90.)  The parties dispute the facts surrounding the Agreement's termination.  Plaintiff contends that Fishman became involved in the marital dispute between Plaintiff and his then-wife, who was also an agent with First Financial, and that Fishman told Plaintiff to leave because he could not handle two divorced people working in the agency.  (Karpf Dep. 77-82.)  Fishman claims that Plaintiff made an independent decision to transfer to another general agent after Plaintiff determined that he could no longer work in the same agency as his estranged wife.  (Fishman Dep. 107.)  On or about April 2, 2008, Plaintiff signed a career contract with Howard Cowan ("Cowan"), another MassMutual general agent, to work under the auspices of his general agency, the Cowan Financial Group (the "Cowan Agency").  (Karpf Dep. 89-90; Kupersmith Dep. 12-13.)  The Cowan Agency is designated as "A047" by MassMutual.  (Kupersmith Dep. 61.)  When Plaintiff transferred from First Financial to the Cowan Agency, he was one of

MassMutual's most successful full-time agents. (Pugh Dep. 17-18; Fishman Dep. 69, 95; Pl.'s Opp. Br. 4, ECF No. 80.) By May 2008, Plaintiff had approximately 3,500 clients.[3] (Defs.' SJ Br. 19.)

When an agent transfers from one MassMutual general agency to another, the agent's book of business—the policies for which he is the writing and servicing agent or the servicing agent—are transferred from the former agency to the new one in a process referred to as a "block transfer." (Ranck Dep. 26, 57, 86.) Policies for which the transferring agent is listed only as the writing agent do not transfer. (Kupersmith Dep. 115.) The block transfer process must be initiated by the general agent that the individual agent is leaving—in Plaintiff's case, Fishman— who must provide MassMutual written authorization to transfer the agent's book of business to the new agency. (Ranck Dep. 12, 45; Pugh Dep. 38-39.) When a transferring agent's book of business includes policies jointly written with other agents, the general agent who supervised the original writing of the policy typically decides whether the servicing of such policies remains at the former agency or transfers with the agent to the new agency. (Pugh Dep. 31-32, 38-40, 45, 51.) Commission sharing arrangements, however, remain in force irrespective of whether the policies transfer with the moving agent. (Pugh Dep. 52; Kupersmith Dep. 93.)

Edward Ranck, a relationship manager at MassMutual, oversaw the transfer of Plaintiff's business from First Financial to the Cowan Agency. (Ranck Dep. 10-11.) During this process, Ranck was supervised by MassMutual agency vice president Ed Youmell, who reported to regional vice president Burvin Pugh. (Pugh Dep. 11-12, 16.) According to Ranck, Plaintiff's book of business could not be transferred to the Cowan Agency until MassMutual received Fishman's approval. (Ranck Dep. 12, 45.) In addition, Fishman was responsible for deciding,

---

[3] Although the record does not reflect the location of Plaintiff's policyholder clients, he testified that one of his clients was a law firm in Philadelphia. (Karpf Dep. 178.)

and telling MassMutual whether certain policies transferred to the Cowan Agency or remained with First Financial. (*Id.* at 29; Pugh Dep. 45.)

The transfer of Plaintiff and his book of business to the Cowan Agency led to acrimony between Plaintiff and Fishman, and became a "sensitive issue" for MassMutual. (Pl.'s Opp. Br. Exs. 25, 26, ECF No. 80.) Plaintiff claims that Fishman threatened to assign Plaintiff's book of business to other agents and destroy his entire business. (Karpf Dep. 81.) Although Fishman denies making such threats, and testified that he was supportive of Plaintiff, his testimony acknowledges that the transfer was a financial loss for First Financial:

> Q. Explain to me how you were losing [because of Plaintiff's transfer]?
>
> A. Well, if Doug is no longer affiliated with my agency, his production no longer goes through the agency. The agency generates revenue based upon the agent being part of the agency. So if he's no longer here, that's a loss for me, but once he made his decision, I was going to support him.

(Fishman Dep. 114, 132-33; *see also* Pl.'s Opp. Br. Exs. 22, 27.) Fishman further testified that "[i]t was a bad situation for me that [Plaintiff] decided to transfer." (Fishman Dep.109.)

Fishman did not send MassMutual his approval for the block transfer until April 30, 2008, almost a month after Plaintiff joined the Cowan Agency. (Defs.' SJ Br. Ex. 20.) Before providing approval, Fishman asked MassMutual to provide him a list of all the existing and pending policies in Plaintiff's book of business. (Pl.'s Opp. Br. Exs. 17, 18.) Fishman and First Financial's chief financial officer, Pam Agostini, also sought input from Youmell regarding the impact of the transfer on First Financial's business and regarding Fishman's effort to obtain compensation from the Cowan Agency for the transfer.[4] (*Id.* at Exs. 1, 22, 27, 28.) Regarding the compensation issue, Agostini suggested to Fishman that he delay the transfer process:

---

[4] Youmell's email communications with Fishman and MassMutual personnel suggest that Youmell favored Fishman and his agency with regard to Plaintiff's transfer, and one email indicates that Youmell instructed his subordinates to communicate only with Fishman's agency regarding the block transfer process. (Pl.'s Opp. Br. Ex. 25; *see also id.* at Exs. 1, 17, 21, 22.)

"Howard [Cowan] has been pretty unethical in how this whole situation has handled, so probably will give you a hard time—but in the meantime can't we hold up the transfer?  Make like slightly more difficult for them . . . as Doug has to fill out a form for each policy to be transferred."  (*Id.* at Ex. 1 (ellipses in original); *see also id.* at Ex. 17.)

The record reflects that once the block transfer was approved and underway, Fishman instructed or advised MassMutual not to transfer certain policies that Plaintiff was servicing.  On May 21, 2008, in an email updating Youmell on the transfer, Ranck advised, in relevant part:

> Similar to the list already provided, some cases Karpf was servicing Harris [Fishman] may be looking to retain in A074 and as you said, the ball is in his court on this.  I think it will get very interesting once we confirm we're finished and 047/Karpf start screaming that certain policies should have moved and did not.  Remember, we've continued to confirm that any policy Karpf was servicing would move over and we both know Harris has decided to have us keep some of them in A074.

(*Id.* at Ex. 24.)

By June 4, 2008, the transfer of Plaintiff's business was ostensibly complete.  (Karpf Dep. 108-09; Defs.' SJ Br. Ex. 21.)  Plaintiff contends that the transfer of his business was completed improperly and that it "changed the complexion of [his] business" to his detriment.  (Karpf Dep. 109; Pl.'s Opp. Br. 21.)  In addition, Plaintiff claims that Fishman did not approve the transfer of many policies for which Plaintiff was the rightful servicing agent, and that Fishman wrongfully assigned policies serviced by Plaintiff to other agents at First Financial.  (Pl.'s Opp. Br. Ex. 24; Defs.' SJ Br. Ex. 21; Karpf Dep. 102-04; Brattelli Dep. 60.)

On April 3, 2009, ten months after the initial block transfer, Plaintiff learned that First Financial had submitted a Producer Change Form directing MassMutual to remove Plaintiff as the designated agent on approximately 313 policies and replace him with John Brattelli, of First Financial.  (Karpf Dep. 150; Pl.'s Opp. Br. Ex. 10; *see also* Pl.'s Opp. Br. 21 & Ex. 12.)  The policies at issue are ones that were originally included in Plaintiff's May 2008 block transfer, and

prior to this change, Plaintiff had been designated as the writing and serving agent on most of these policies. (Pl.'s Opp. Br. Exs. 10, 11, 12.) In protest, Plaintiff responded, "[t]hese are 100 percent clients of mine on the list." (Karpf Dep. 150; Pl.'s Opp. Br. Ex. 11.) At his deposition, Plaintiff explained that "[t]here's [] people [who were transferred] that have totally nothing to do with John Brattelli. He doesn't know them. . . . Fishman signed a piece of paper without any proper investigation, due diligence, anything, just gave my clients to another agent to purposely hurt me and do harm and steal my business." (Karpf Dep. 151-52.) According to Brattelli, most of the 313 policies should not have been included in the 2008 block transfer because he, not Plaintiff, was the rightful writing and servicing agent. (Brattelli Dep. 60-63.) However, Brattelli conceded that some of the transferred policies properly belonged with Plaintiff. (*Id.* at 60.)

On April 16, 2009, First Financial submitted to MassMutual a second Producer Change Form, this one changing the assigned agent on 62 of the policies from Brattelli back to Plaintiff. (Pl.'s Opp. Br. Exs. 12, 13; Brattelli Dep. 73-74.) The remaining 251 policies continued to be assigned to Brattelli at First Financial. According to Plaintiff, not only did Defendants improperly transfer his clients to Brattelli and other agents, the transfers initiated by Fishman and First Financial "mixed up the writing agent and the servicing agent," causing Plaintiff to lose commissions. (Karpf Dep. 159-60, 175-77, 183.) Because a policy's writing agent receives renewal commissions over the lifetime of the policy, while a servicing agent only collects commission for a limited number of years, Plaintiff contends that the incorrect designations on these policies resulted in the loss of many renewal commissions. (*Id.* at 183.) Defendants assert that the transfers were proper and intended to correct previous errors in the block transfer and agent designations. (Defs.' SJ Br. 12-13; Brattelli Dep. 60-63, 73-74.) The dispute regarding the April 2009 policy transfer has not been resolved.

In addition to the alleged improprieties in the transfer, Plaintiff contends that Defendants took other steps to damage his business. MassMutual agents manage their client portfolios on an electronic database called FieldNet. (Karpf Dep. 99.) During the weeks following his transfer, Plaintiff was apparently locked out of FieldNet and unable to access his clients' electronic files. (*Id*. at 98.) According to Plaintiff, Fishman caused him to be denied access, but he does not know how this was accomplished. When asked how Fishman prevented him from viewing information in the MassMutual system, Plaintiff testified: "I don't know the internals of how he blocked my business . . . but . . . he had inner workings and was working behind the scenes and utilizing his people that he knows in the home office to hurt me . . . I don't know what he was doing . . . I couldn't tell you. But he was certainly doing it." (*Id.* at 113.) Although FieldNet is a MassMutual database, the evidence indicates that general agents have the ability to request or direct MassMutual's client service department to revoke an agent's access to the database. (Fishman Dep. 151; *see also* Pugh Dep. 33.) In fact, Fishman's testimony reflects that he has had occasion in the past to lock someone out of the system. (Fishman Dep. 151.) Pugh testified that the reasons an agent might be locked out of the system could include termination for cause, disputes with other agents, and if "there were issues around . . . who was controlling the case or going to work with somebody." (Pugh Dep. 33.)

Plaintiff remained unable to access the electronically stored files even after notifying Fishman and MassMutual representatives that he could not access any of his client information in FieldNet. (Pl.'s Opp. Br. 13-14; Kupersmith Dep. 59-60.) As a result, Plaintiff was unable to provide any services to his client base during this period. (Karpf. Dep. 98.) Without the ability to access client and policy information, Plaintiff could not appropriately respond to client requests for information, meet with clients to update their information or discuss future sales, or

identify policies that were overdue and in danger of lapse.  (*Id.*)  At his deposition, Plaintiff

explained that, "if you cannot service [a policy] and [that] policy is overdue . . . the policy [] can

lapse and if it lapses then I lose the renewal commission."  (*Id.* at 192.)  Certain policies lapsed

while Plaintiff was locked out of FieldNet and, as a result, renewal commissions are no longer

available on those policies.  (*Id.* at 129, 192.)

 Finally, the record reflects that on June 23, 2008, when a client of Plaintiff's called for

him at First Financial, agency personnel falsely told the client that Plaintiff was "no longer with

the company," and did not inform the client that that he was with another MassMutual agency or

provide his office number.  (*Id.* at 140; Kupersmith Dep. 97-98; Pl.'s Opp. Br. Ex. 31.)  Upon

learning of this exchange, the Cowan Agency's chief operating and financial officer, David

Kupersmith, emailed Fishman stating:

> I am absolutely astounded that your agency would tell people who call for Doug
> that he is NO LONGER WITH THE COMPANY.
>
> [This] has to stop IMMEDIATELY.  If someone calls for Doug they should be
> given his Office # which you know full well is [].

(Pl.'s Opp. Br. Ex. 31; *see also* Kupersmith Dep. 97-98.)  According to Plaintiff, there were

several other instances in which First Financial personnel told his clients that he was no longer

with the company.  (Karpf Dep. 142.)

 Plaintiff contends that he became disabled as a result of Defendants' actions.  On June

22, 2009, Plaintiff was approved to receive disability benefits because of his inability to perform

the duties of his occupation.  (*Id.* at 187.)  He has not worked since.  (*Id*. at 193.)  Plaintiff

currently receives treatment for depression and anxiety.  (Pl.'s Opp. Br. 8.)

### B. Procedural History

 Plaintiff commenced this action by filing a Complaint on March 30, 2010.  (Compl., ECF

No. 1.)  Plaintiff originally brought sixteen causes of action against MassMutual, First Financial,

Fishman, and more than twenty additional parties.  (*Id*.)  On June 14, 2010, Plaintiff, Defendants, and MassMutual filed a Joint Motion Requesting Dismissal of Certain Defendants.  (ECF No. 12.)  An Order was entered granting the joint motion on June 15, 2010.  (ECF No. 13.)  On July 12, 2010, MassMutual filed a motion requesting dismissal of the claims asserted against it.  (ECF No. 17.)  On July 26, 2010, Defendants Fishman and First Financial also filed a motion to dismiss.  (ECF No. 22.)  Plaintiff filed a brief in opposition to Defendants' motion to dismiss on September 27, 2010.  (ECF No. 33.)  On that same day, Plaintiff filed a response to MassMutual's request for dismissal.  (ECF No. 34.)  On October 27, 2010, MassMutual filed a Reply.  (ECF No. 41.)  Defendants filed their Reply on November 22, 2010.  (ECF No. 46.)  On November 23, 2010 and January 5, 2011, Plaintiff filed sur-reply briefs in response to MassMutual's and Defendants' reply briefs.  (ECF Nos. 48, 52.)  On March 27, 2014, an Order was entered dismissing MassMutual as a party.  (Order, ECF No. 57.)  In addition, the Order dismissed the following causes of action:  intentional infliction of emotional distress (Count 4), negligence (Count 5), negligent infliction of emotional distress (Count 6), conversion (Count 7), negligent supervision (Count 9), negligent supervision  (Count 10), breach of fiduciary duty (Count 11), aiding and abetting breach of fiduciary duty (Count 12), and civil conspiracy (Count 13).  (*See id*.)

On March 27, 2014, Plaintiff filed an Amended Complaint.  (Am. Compl., ECF No. 58.)  The surviving claims are breach of contract (Count 1), tortious interference with existing contractual relations (Count 2), tortious interference with prospective contractual relations (Count 3), and unfair competition (Count 8).  (*Id*.)  On November 27, 2015, Defendants filed the instant Motion for Summary Judgment.  Plaintiff filed a memorandum of law in opposition to Defendants' Motion for Summary Judgment on January 15, 2016.  On January 25, 2016,

Defendants filed a Reply in further support of summary judgment. (ECF No. 81.) Plaintiff filed a Sur-reply on February 2, 2017. (ECF No. 82.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 461 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. The nonmoving party must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1),

12

(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). A mere scintilla of evidence in support of the nonmoving party's position will not suffice. *Liberty Lobby*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III. DISCUSSION

Plaintiff contends that Defendants' conduct in connection with his transfer from First Financial to the Cowan Agency essentially destroyed his business. Plaintiff asserts claims for breach of contract, tortious interference with existing and prospective contractual relations, and unfair competition. Defendants argue that Plaintiff has not produced sufficient evidence to demonstrate a genuine issue of material fact as to the essential elements of any of his claims.

### A. Breach of Contract

In order to maintain a breach of contract action under Pennsylvania law, a plaintiff must show (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages. *Burton v. Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir. 2013) (citation and internal quotation marks omitted). It is undisputed that Plaintiff and Fishman entered into a contractual agreement when the Career Contract was signed. (*See* Defs.' SJ Br. 17.) Defendants argue that Plaintiff is unable to satisfy the second and third elements of a breach of contract action.

Plaintiff argues that Defendants breached the contractual duty to provide him with his rightfully earned commissions. The Career Contract "provides that Plaintiff will be allowed

first-year commissions, renewal commissions, and renewal service commissions" on Group life, Health business, and Group Pension Plans. (Career Contract 2.) In addition, the Agreement provides that "Active Persistency Fees will be allowed . . . ." (*Id*.) Defendants do not dispute that the Career Contract affords Plaintiff the right to collect earned commissions. Defendants argue that a breach has not occurred because Plaintiff has not been deprived of any compensation that he earned. (Defs.' SJ Br. 19.)

Defendants initially contend that the record is devoid of any evidence demonstrating that Plaintiff was specifically deprived of first-year commissions. (*Id*.) They claim that first-year commissions are unavailable since Plaintiff allegedly stopped pursuing new business by June 2009. (*Id*.) The Third Circuit has observed that, "[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial." *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996) (citation and internal quotation marks omitted). First-year commissions are earned each time new policyholders pay their first-year premiums. A review of the evidentiary record does not disclose any evidence that would permit a reasonable fact finder to conclude that Plaintiff was denied rightfully earned first-year commissions. Other than Plaintiff's broad assertion that he was denied commissions, the record does not contain evidence demonstrating that Defendants interfered with Plaintiff's right to collect commission from his clients' first-year premium payments. *See Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, No. 05-2535, 2012 WL 3279243, at *6 (E.D. Pa. Aug. 13, 2012) (citations omitted) (noting that self-serving deposition testimony is insufficient to withstand a motion for summary judgment). Accordingly, Plaintiff's breach of contract action cannot rest on the failure to provide first-year commissions.

Turning to the other forms of commission and compensation, there is evidentiary support for Plaintiff's claim that he was deprived of rightfully-earned renewal and renewal service commissions, and persistency fee entitlements.  In this respect, Defendants again argue that "there is absolutely no evidence that suggests that Plaintiff was deprived of any [] commissions." (Defs.' SJ Br. 19.)  Defendants note that "Plaintiff continues to earn compensation on renewals to date."  (*Id.*)  Plaintiff's claim regarding Defendants' interference with his compensation is two-fold.  First, Plaintiff contends that Defendants indirectly denied him renewal compensation by contributing to both the delay of Plaintiff's block transfer and his inability to access client data.  Next, Plaintiff contends that Defendants' own deliberate actions directly resulted in the loss of renewal commissions, renewal service commissions, and persistency fees.  Plaintiff specifically alleges that Fishman improperly changed the designation of Plaintiff's role on numerous policies.  We consider each alleged breach in turn.

Plaintiff's Agreement with Fishman terminated in April 2008, when he transferred to the Cowan Agency.  As was standard practice at MassMutual, Plaintiff's book of business was to transfer to the Cowan Agency along with Plaintiff.  According to Ranck, such a transfer could not proceed without authorization from Fishman.  Ordinarily, a policy transfers with the agent whenever that agent is listed as the policy's writing and servicing agent or servicing agent.  As Plaintiff's general agent, Fishman was entitled to confirm that Plaintiff was listed as the servicing or writing and servicing agent on each policy for which approval to transfer was sought.  After verifying Plaintiff's designation, Fishman was responsible for approving the transfer.  A supervising general agent does not typically have any other involvement in the transfer process.  (Ranck Dep. 23.)

The transfer of Plaintiff's book of business faced unusual delay.  Plaintiff was unable to access his clients' electronically stored files during the delay.  Consequently, Plaintiff could not effectively provide services to his client base during the weeks following his transfer.  Plaintiff contends that Fishman caused the delay and his inability to access client data.  Plaintiff argues that as a consequence, he lost commissions he would otherwise have earned.

Defendants deny improper involvement in the transfer of Plaintiff's book of business.  They contend "[t]he record unambiguously reflects [that] Fishman's only role with the transfer process was to approve the block transfer, which he did very shortly after the agreement was finalized for Plaintiff to join Cowan [Financial]."  (Defs.' SJ Br. 18.)  Denying any additional participation, Fishman acknowledges that he did not take any affirmative steps to ensure that the transfer was properly completed.  At his deposition, Fishman said that he requested Plaintiff's entire book of business in April 2008 because he simply "wanted to make sure that all of the clients were transferred effectively to Cowan [Financial]. . . ."  (Fishman Dep. 122.)  When asked about the transfer procedure more generally, Fishman testified that First Financial does not control any of the process because the agency loses access to an agent's information once that agent transfers to a different agency.  These assertions, in addition to being self-serving, are inconsistent with other evidence in the record.

That evidence reflects that Fishman's participation in the transfer was more extensive than he contends.  Although Fishman contends that he "did nothing to delay the process" (Fishman Dep. 146), the evidence shows that Fishman did not approve the transfer until the very last day of April 2008—a delay of nearly one month after Plaintiff's departure from First Financial.  Under usual circumstances, book transfers were routinely completed within 30 days of the transfer request date.  (Ranck Dep. 83.)  Plaintiff transferred to Cowan Financial at the

very beginning of April 2008, but the transfer of his book of business was not completed until June of that year. The evidence in this record supports an inference that Fishman not only withheld approval of the block transfer for almost 30 days, but also that his subsequent actions while the transfer process was underway caused further delay.

Although Fishman sent correspondence ostensibly approving the block transfer on April 30, 2008, the record shows that, by May 21, 2008, Fishman had not yet advised MassMutual whether certain policies would be transferred. In an email to MassMutual agency vice president Youmell, Ranck provided the following update:

> Once Fishman provides a list of policies that were joint cases between Brattelli and [Plaintiff] we'll do another analysis. Similar to the cases already provided, some cases [Plaintiff] was servicing Harris may be looking to retain in A074 and as you said, the ball is in his court on this. I think it will be very interesting once we confirm we're finished and 047 /[Plaintiff] start screaming that certain policies should have moved and did not. Remember, we've continued to confirm that any policy [Plaintiff] was servicing would move over and we both know [Fishman] has decided to have us keep some of them in A074.

(Pl.'s SJ Resp. Ex. 24.) Ranck's email shows that Fishman's delay in approving or disapproving the transfer of the policies at issue continued through May 2008. It also unambiguously reflects that MassMutual could not complete the block transfer until it received information from Fishman. We are satisfied that Plaintiff has produced sufficient evidence to raise a genuine issue of material fact regarding whether Defendants are responsible for delaying the transfer of Plaintiff's book of business.

In addition to denying participation in the transfer delay, Fishman disclaims any involvement in Plaintiff's inability to access his clients' electronically stored records. Neither party offers concrete evidence unequivocally demonstrating that Fishman personally locked Plaintiff out of the MassMutual database while the transfer was pending. However, the evidence does support an inference that Fishman was responsible—directly or indirectly—for the lock out.

We reiterate that "[i]n reviewing the record, the court must give the nonmoving party the benefit of all reasonable inferences." *Lawrence*, 98 F.3d at 65 (citation and internal quotation marks omitted). The evidence establishes that a general agent can cause an agent to be locked out of MassMutual's system, and Fishman specifically testified that he has had occasion in the past to lock someone out of the system. The record also indicates that the reasons for such a lock out may include, *inter alia*, "termination for cause," "disputes with other agents" and "[i]f there were issues around . . . who was controlling the case or going to work with somebody." (Pugh Dep. 33.) Similarly, Kupersmith testified that, other than in the event of a technological malfunction, a transferring agent could lose access to his clients' files only when the general agent responsible for authorizing the transfer of policies "had not done what might have been necessary to effect the transfer." (Kupersmith Dep. 62.) Kupersmith further explained that since Plaintiff was unable to access his clients' files, it was "obvious" that Fishman had not yet authorized the transfer of the clients at issue. (*Id.* at 64-65.) Kupersmith's deposition testimony is consistent with an email he sent to Plaintiff in 2008. In response to Plaintiff's complaint that he could not view his clients' portfolios, Kupersmith wrote, "[y]ou cannot do anything as far as I know until Harris Fishman authorizes a block transfer." (*Id.* at 64.) The Third Circuit has instructed that "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 511-12 (3d Cir. 1994) (citation and internal quotation marks omitted). Together, the evidence here supports a reasonable inference that Fishman was directly or indirectly responsible for Plaintiff's inability to access his clients' files.

Plaintiff alleges that his inability to access his clients' information had a detrimental effect on his commission entitlements. Plaintiff contends that as a result of being locked out of MassMutual's electronic database, he was neither able to work with his existing clients nor obtain new business. In addition, Plaintiff alleges that he lost income and client relationships because certain policies lapsed while he was prevented from managing them. Plaintiff's claim is corroborated. Kupersmith's testimony confirms that an agent who has been denied access to his clients' data cannot provide services to his clients. Plaintiff's job was to sell insurance products and renewals on expiring products, and without access to MassMutual's system, he could do neither. Plaintiff has sufficiently demonstrated that he suffered financially as a consequence of Defendants' alleged actions. Pugh explained that the "most obvious reason" an agent would lose income from a particular policy is because of a subsequent lapse, which occurs when a client stops making renewal premium payments." (Pugh Dep. 55-56.) In such a situation, renewal commissions are no longer awarded. (*Id*. at 56.) Pugh explained that MassMutual insurance products must be "actively managed." (*Id*. at 57.) Plaintiff lost access to thousands of clients' information during the course of at least two months. Because there are disputed issues of fact as to whether Defendants disrupted Plaintiff's business by preventing him from accessing client information, summary judgment must be denied.

Plaintiff's breach of contract action rests on additional alleged misconduct. Plaintiff also argues that Defendants breached the Career Contract when Fishman improperly removed Plaintiff as the designated writing and/or servicing agent on many insurance policies. This claim involves two separate incidents—one in May 2008 and another in April 2009. Plaintiff alleges that Fishman's role in May 2008 was not limited to authorizing the transfer of Plaintiff's book of business. By Plaintiff's account, Fishman changed Plaintiff's designation on a number of

policies, thereby rendering them ineligible for transfer to the Cowan Agency. Plaintiff avers that, as a result, his corresponding commission entitlements were negatively affected. In response, Defendants rely on an email authored by Ranck to contend that by June 4, 2008, "any business for which Plaintiff was the servicing/writing agent was moved over as well as business that Plaintiff was currently the servicing agent of record." (Defs.' SJ Br. 9.)

The record contains evidence that conflicts with Defendants' account and with Ranck's 2008 affirmation to Plaintiff. As discussed above, on May 21, 2008, Ranck sent an email to Youmell stating, in part: "Remember, we've continued to confirm that any policy [Plaintiff] was servicing would move over and we both know [Fishman] has decided to have us keep some of them in A074." (Pl.'s Opp. Br. Ex. 24.). This correspondence indicates that Fishman was, in essence, directing MassMutual not to transfer every policy for which Plaintiff was the servicing agent or writing and servicing agent, despite the fact that MassMutual normally would—as it confirmed to Plaintiff—transfer all such policies. This evidence directly contradicts Defendants' averments and is sufficient to create an issue of disputed fact with respect to the May 2008 events.

Plaintiff alleges that Defendants engaged in similar conduct in early April 2009, when First Financial submitted a Producer Change Form bearing Fishman's signature and directing MassMutual to remove Plaintiff as the designated agent on more than 300 client accounts and replace him with Brattelli, a First Financial agent. Shortly thereafter, Defendants submitted a second Producer Change Form, again bearing Fishman's signature, directing Mass Mutual to transfer 62 of those accounts back to Plaintiff from Brattelli. Plaintiff contends that these policy transfers were part of a wrongful effort to ruin his business, and that this wrong was compounded because Fishman and First Financial "mixed up the writing agent and the servicing agent."

(Karpf Dep. 156-57, 159-60, 176-77.)  Defendants assert that the transfers were proper and merely intended to correct previous errors in the block transfer and agent designations.  In his deposition, Fishman testified that he lacked the authority to transfer Plaintiff's policies to Brattelli once Plaintiff had joined the Cowan Agency and, although his testimony was equivocal, he insinuated that Plaintiff and/or the Cowan Agency participated in the April 2009 transfer decisions.  (Fishman Dep. 155-64.)  In contrast, other evidence indicates that the April 2009 transfers were unilaterally initiated by First Financial and objected to by Plaintiff and the Cowan Agency.  On April 23, 2009, in an email to Youmell, Ranck advised:

> Okay, I've uncovered 2 major volume requests, 1) policies being moved from Brattelli to Karpf, and 2) the exact opposite.  Howard [Cowan] has been on the phone with our area several times and is very upset that this is happening.  He's been throwing my name around a bit saying I said this was "all set" last year when it was something Fishman and Cowan needed to work out.  The interesting thing is both requests came from A074 Fishman.
>
> Back me up on this if it comes your way and I'm going to have to call 074 on this.  I don't have a choice.
>
> Here we go again. . . .

(Pl.'s Opp. Br. Ex. 12; *see also id.* at Ex. 11.)

This evidence sufficiently creates a genuine issue of disputed fact with respect to whether Defendants improperly authorized the change of Plaintiff's designation on more than 300 policies.  "On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative."  *Lawrence*, 98 F.3d at 67 (citation and internal quotation marks omitted).  Summary judgment is not appropriate here, where the movant's self-serving averments cannot be reconciled with the non-movant's conflicting evidence.

Finally, Plaintiff's breach of contract claim can withstand summary judgment only if he can sufficiently prove the alleged breach resulted in damages.  *See Burton*, 707 F.3d at 431 (citation and internal quotation marks omitted).  Under Pennsylvania law, Plaintiff "may recover

all damages, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty." *Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 10 (Pa. Super. Ct. 2015) (citation and internal quotation marks omitted).

Principally, Plaintiff's alleged damages consist of commissions and other income that he lost and continues to lose as a result of incorrect designations of his role on hundreds of MassMutual policies. Plaintiff contends that he continues to lose income since his book of business has never been completely transferred as a result of Fishman's actions.

In response, Defendants claim that Plaintiff cannot demonstrate resultant damages because: (1) "Plaintiff then had his best year in many years in 2008 after joining [the Cowan Agency]"; (2) Plaintiff was not denied any first-year commissions and "continues to earn commissions on the joint business to date"; and (3) "the clients transferred to Brattelli were rightfully customers of Brattelli who was the original soliciting agent." (Defs.' SJ Br. 19.) Defendants' contentions are unavailing. The fact that Plaintiff had financial success in 2008 does not foreclose his contention that, but for Defendants' wrongful conduct, he would have enjoyed even greater success. Similarly, the fact that Plaintiff still earns some commissions does not mean he was not denied additional compensation to which he was entitled. Finally, the propriety or impropriety of the policy transfers is a disputed factual issue that must be determined by a jury. Accordingly, summary judgment will be denied as to Count 1.

### B. Tortious Interference Claims

Counts 2 and 3 of Plaintiff's Amended Complaint allege that Defendants tortiously interfered with Plaintiff's existing and prospective contractual relations. As to both counts,

Defendants argue that summary judgment should be granted based on the absence of evidence that Defendants undertook any purposeful action to induce a third party—namely an existing or prospective client—to breach or decline to purchase a MassMutual insurance policy. According to Defendants, Pennsylvania courts have not adopted Restatement (Second) of Torts §§ 766A and 766B(b), which make actionable tortious conduct directed at the plaintiff, rather than at a third party. Defendants further argue that they are entitled to summary judgment because Plaintiff cannot establish that he was a party to any existing or prospective contract that was allegedly interfered with by Defendants.

In response to Defendants' arguments, Plaintiff contends that his tortious interference claims may not be governed by Pennsylvania law, but instead by the laws of either New Jersey or Massachusetts, both of which, Plaintiff claims, may recognize tortious interference claims under sections 766A and 766B(b) of the Restatement (Second) of Torts. Plaintiff further argues that summary judgment is inappropriate even under Pennsylvania law, based on the evidence of Defendants' actions directed at MassMutual and Plaintiff's clients.

Because the parties' have raised a potential conflict of laws, we first outline the analytical framework applicable to choice of law determinations.

1.    *Choice of Law Framework*

In a diversity case such as this, we apply the choice of law rules of the forum state, Pennsylvania. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Pennsylvania choice of law analysis is issue-specific, and different states' laws may apply to different issues within a case. *Berg Chilling Sys., Inc. v. Hull*, 435 F.3d 455, 462 (3d Cir. 2006). As to each issue, the court must first determine if there is an "actual or real" conflict between the potentially applicable laws. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If the

jurisdictions' laws are the same, there is no conflict, and a choice of law analysis is unnecessary. *Id.* If there are relevant differences between the laws, an actual conflict exists, and the court must then determine if the conflict is "true," "false," or "unprovided-for." *Id.* A "true" conflict exists only if "*both* jurisdictions' interests would be impaired by the application of the other's laws." *Id.* If the court identifies a true conflict, it "must then determine which state has the 'greater interest in the application of its law.'" *Id.* at 231 (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 855 (Pa. 1970)). In this analysis, Pennsylvania uses a methodology that combines the "governmental interest analysis" with the Second Restatement of Conflict's "most significant relationship" test. *Carrick v. Zurich-Am. Ins. Grp.*, 14 F.3d 907, 909 (3d Cir. 1994); *see also Hammersmith*, 480 F.3d at 231. In conducting a choice of law analysis, courts may consider such issues as the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, and place of business of the parties; and the place where the relationship between the parties is centered. Restatement (Second) of Conflict of Laws § 145(2) (1971). A choice of law analysis is "fact-intensive: 'Each choice-of-law case presents its own unique combination of facts—the parties' residence, the place and type of occurrence and the specific set of governmental interest—that influence the resolution of the choice-of-law issue presented.'" *Warriner v. Stanton*, 475 F.3d 497, 500 (3d Cir. 2007) (quoting *Erny v. Estate of Merola*, 792 A.2d 1208, 1221 (N.J. 2002)). A court should conduct a choice-of-law inquiry only where necessary. *Hammersmith*, 480 F.3d at 230.

We apply this framework separately to Counts 2 and 3.

### 2. *Interference with Existing Contractual Relations*

Pennsylvania, New Jersey, and Massachusetts all treat as actionable tortious interference with existing contractual relations. To a large extent, all three jurisdictions also analyze tortious

interference claims by reference to the Restatement (Second) of Torts (1979), which addresses

interference with existing contractual relations in two separate sections.  Restatement (Second)

of Torts §§ 766, 766A.[5]  Section 766 applies to interference that is directed at a third party and

provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person <u>by inducing or otherwise causing the third person not to perform the contract</u>, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id.* at § 766 (emphasis added).  Where the interference is directed at the Plaintiff, section 766A is

implicated.  That section states:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, <u>by preventing the other from performing the contract or causing his performance to be more expensive and burdensome</u>, is subject to liability to the other for the pecuniary loss resulting to him.

*Id.* at § 766A (emphasis added).

Pennsylvania, New Jersey, and Massachusetts all have adopted or consistently follow

Restatement (Second) of Torts § 766.  *See, e.g.*, *Adler, Barish, Daniels, Levin, & Creskoff v.*

*Epstein*, 393 A.2d 1175, 1183 (Pa. 1978) (adopting section 766); *Nostrame v. Santiago*, 61 A.3d

---

[5]  The previous version of the Restatement defined tortious interference with existing and prospective contractual relations in a single section.  Restatement (First) of Torts § 766 (1939).  That section provided:

> Except as stated in Section 698, one who, without privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another
> is liable to the other for the harm caused thereby.

*Id.*  The Restatement (First) did not include a provision corresponding to section 766A of the Restatement (Second).

893, 900-01 (N.J. 2013) (citing section 766); *United Truck Leasing Corp. v. Geltman,* 555 N.E.2d 20, 23 (Mass. 1990) (adopting section 766).

However, the Pennsylvania Supreme Court has not adopted section 766A, and the Third Circuit has predicted that it would decline to do so. *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660-61 (3d Cir. 1993) ("The parties have not cited nor have we discovered any Pennsylvania cases recognizing a separate cause of action for preventing plaintiff's performance of his own contract."); *Gemini Physical Therapy & Rehab.*, 40 F.3d 63, 66 (3d Cir. 1994) ("[C]ausing performance of a contract to be more costly 'as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action.'" (quoting *Price v. Sorrell*, 784 P.2d 614, 616 (Wyo. 1989))).[6] Based on the Third Circuit authority cited above, a claim of tortious interference based on conduct directed at the plaintiff, rather than a third party, is not cognizable in Pennsylvania.

The status of section 766A under New Jersey law is not entirely certain, and we have not identified any New Jersey state court decisions expressly adopting section 766A or recognizing a tortious interference claim that is predicated on interference directed at the plaintiff. However, New Jersey courts have cited to section 766A, along with the other Restatement provisions addressing tortious interference. *See, e.g.*, *Nostrame*, 61 A.3d at 900-01 (citing sections 766 and 766B to describe the "recognized family of business torts"); *Dello Russo v. Nagel*, 817 A.2d 426, 434 (N.J. Super. Ct. App. Div. 2003) (citing comment to section 776A to define intentional

___

[6] *See also Cottman Transmission Sys., LLC v. Bence*, No. 03-5467, 2004 WL 739907, at *3 (E.D. Pa. Apr. 5, 2004) (stating that Pennsylvania has not adopted section 766A); *Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc.*, No. 03-232, 2003 WL 22797730, at * 9-10 (E.D. Pa. Nov. 18, 2003) (same); *Leopold Graphics, Inc. v. CIT Grp./Equip. Fin., Inc.*, No. 01-6028, 2002 WL 1397449, at *4 (E.D. Pa. June 26, 2002) (declining to recognize a cause of action under section 766A); *Peoples Mortg. Co., Inc. v. Fed. Nat'l Mortg. Ass'n*, 856 F. Supp. 910, 931 (E.D. Pa. 1994) (stating that Pennsylvania has not adopted section 766A). *But see Rossi v. Schlarbaum*, 600 F. Supp. 2d 650, 659 (E.D. Pa. 2009) ("Pennsylvania courts have adopted the law as stated in the Restatement (Second) of Torts §§ 766-774A.")

interference); *Cedar Ridge Trailer Sales, Inc. v. Nat'l Cmty. Bank of N.J.*, 711 A.2d 338, 345 (N.J. Super. Ct. App. Div. 1998) (same). In addition, the Third Circuit has stated that in formulating the cause of action for tortious interference with a prospective or existing economic relationship, "New Jersey courts have relied on the Restatement (Second) of Torts §§ 766A and 766B." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)); *see also Juice Entm't, LLC v. Live Nation Entm't, Inc.*, No. 11-7318, 2012 WL 2576284, at *3 (D.N.J. Jul. 3, 2012) (finding that plaintiff failed to sufficiently allege the elements of a section 766A tortious interference claim under New Jersey law (citing *Lightning Lube, Inc.*, 4 F.3d at 1167)).

Under Massachusetts law, a claim based on Restatement (Second) of Torts § 766A is clearly actionable. In 2000, the Massachusetts Supreme Judicial Court expressly adopted section 766A, finding "no compelling reason" not to recognize the conduct described in section 766 as being tortious. *Shafir v. Steele*, 727 N.E. 2d 1140, 1144 (Mass. 2000).

Accordingly, the applicability of section 766A implicates a potential conflict between the law of Pennsylvania and the laws of Massachusetts and New Jersey. However, we need not resolve that potential conflict here because, regardless of whether Plaintiff's claim arises under section 766 or 766A, he cannot establish the first element of his claim for tortious interference with existing contractual relations. Under the laws of all three potentially applicable jurisdictions, Plaintiff must be a party to an actual contract with a third party that is not a Defendant. *Compare Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super. Ct. 1987) ("Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a 'third person' other than the defendant."), *with Dello Russo*, 817 A.2d at 434 ("To establish a claim for tortious interference with

27

contractual relations, a plaintiff must prove: (1) actual interference with a contract . . . ."); and *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 632 (Mass. 2001) ("In an action for intentional interference with contractual relations, the plaintiff must prove that (1) he had a contract with a third party . . .").

In Count 2, the Amended Complaint specifically states that "Plaintiff had existing and/or ongoing contractual relations and/or business relationships with his clients" and that "Defendants took purposeful action specifically intended to harm those existing contractual relations and/or business relationships." (Am. Compl. ¶¶ 164-165.) Defendants contend that Plaintiff has failed to identify any existing contracts that were not performed by a third party as a result of Defendants' conduct. We agree.[7] Although Plaintiff has a business relationship with his clients—the policyholders—he is not a party to the insurance policies, which are agreements between the clients and MassMutual. With respect to MassMutual, Plaintiff acts only as an agent, and although MassMutual approved the Career Contract, it is not a party to the Agreement. The Career Contract expressly contemplates this arrangement, defining the limits of Plaintiff's authority and the contours of his business relationship with MassMutual. The only contractual relationship Plaintiff had was with Fishman, who, as a party to the Career Contract, cannot tortiously interfere with that Agreement. *See Rutherford v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992) (noting that parties to a contract or employment relationship cannot assert tortious interference with contract against each other); *Printing Mart-Morristown*, 563 A.2d at 38 ("Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law."); *Gram v. Liberty Mut. Ins. Co.*,

---

[7] Moreover, under Pennsylvania law, "[i]t is well established that a person acting as an agent for a disclosed principal is not a party to the contract." *Perlman v. Pittsburgh Cabinets & Builders Supplies, Inc.*, 156 A.2d 373, 375 (Pa. Super. Ct. 1959).

429 N.E. 2d 21, 24 n.3 (Mass. 1981) (noting that defendant could not be liable for tortious interference with its own contract with plaintiff).

Because the evidence does not reveal any interference with a contract to which Plaintiff was a party, we will grant summary judgment as to Count 2.

### 3.    *Interference with Prospective Contractual Relations*

As with Count 2, Defendants argue that under Pennsylvania law, the claim in Count 3 for tortious interference with prospective contractual relations requires proof of interfering conduct directed at a third party.  According to Defendants, "Plaintiff has not and cannot meet his burden of proof with respect to showing acts by Defendants directed to third parties which interfered with a prospective contractual relationship."  (Defs.' Br. 23.)  Plaintiff disputes Defendants' contention and argues that:  (1) New Jersey or Massachusetts law may apply and permit this claim to the extent it is based on Defendants' conduct directed at Plaintiff; and (2) even assuming that Defendants' statement of Pennsylvania law is correct and that Pennsylvania law applies, the evidence in this case shows conduct by Defendants directed at third parties—specifically, Plaintiff's clients and MassMutual.

Once again, the law of Pennsylvania appears to differ from the laws of New Jersey and Massachusetts in the extent to which it follows the Restatement (Second) of Torts' formulation of interference with prospective contractual relations.  With respect to Count 3, the difference in these states' laws is relevant, and we must address that conflict.  *See CAT Internet Servs., Inc. v. Magazines.com Inc.*, No. 00-2135, 2001 WL 8858, at *3 (E.D. Pa. Jan. 4, 2001) (finding that a conflict existed where one state recognized the cause of action at issue and the other state did not).  Here, we note that the parties' briefs provide only limited analysis of the fact-intensive choice of law issues implicated by their arguments.  As is set forth below, we apply Pennsylvania

law and find that even under its more restrictive formulation of the tortious interference claim alleged in Count 3, summary judgment is not warranted.

The Restatement (Second) of Torts defines tortious interference with prospective contractual relations as follows:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B. "Section 776B, the Restatement provision dealing with interference with prospective contracts, is parallel to [section] 776: Section 766B(a) deals with interference directed at third parties and [section] 766B(b) deals with interference directed at [the party asserting the tortious interference claim]." *Cottman Transmission Sys.*, 2004 WL 739907, at *3.

Based on their explicit or implicit adoption of section 766A, New Jersey and Massachusetts would appear to recognize the corresponding claim under section 766B(b) for interference with a prospective contractual relationship where the interference is directed at the plaintiff rather than a third party. *See Della Russo*, 817 A.2d at 434 (citing section 766A); *Blackstone v. Cashman*, 860 N.E.2d 7, 12 (Mass. 2007) (treating a claim under section 766B(b) as cognizable). Under Pennsylvania law, however, the weight of authority indicates that a claim under section 766B(b) is not cognizable.

The Pennsylvania Supreme Court adopted Restatement (First) of Torts § 766 in *Birl v. Phila. Electric Co.*, 167 A.2d 472, 474 (Pa. 1961), and Pennsylvania has recognized the tort of interference with prospective contractual relations since at least the time of the First Restatement.

*Glenn v. Point Park Coll.*, 272 A.2d 895, 897 and n.3 (Pa. 1971).[8] Subsequently, in *Thompson*

*Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979), the court referred to the Restatement

(Second)'s formulation of tortious interference with prospective contractual relations, but then

analyzed that tort under the elements derived from the Restatement (First). Based on the

ambiguity in the *Thompson* opinion,[9] the Third Circuit and a number of district courts have held

that Pennsylvania has not adopted section 766B, at least not in its entirety.[10] *See Windsor*, 986

F.2d at 661 ("[T]he Pennsylvania Supreme Court has not adopted § 766B of the Restatement

(Second)."); *Silver v. Mendel*, 894 F.2d 598, 601 (3d Cir. 1990) (same); *Leopold Graphics,* 2002

WL 1397449, at *5 (observing that Pennsylvania courts have not adopted section 766B *in toto*);

*Peoples Mortg. Co.*, 856 F. Supp. at 932 n.15 (same). *But see Big Apple BMW, Inc. v. BMW of*

*North Am., Inc.*, 974 F.2d 1358, 1381 & n.17 (3d Cir. 1992) (stating that section 766B has been

adopted by Pennsylvania, but noting that in analyzing prospective contractual advantage claim,

"proper recourse should be made to section 766 of the Restatement (First) of Torts" (citing

*Silver*, 894 F.2d at 601-02)); *Int'l Diamond Imp., Ltd.*, 40 A.3d at 1274 (framing elements of the

---

[8] As noted above, the Restatement (First) addressed interference with both existing and prospective contractual relations in section 766.

[9] *See Global Arena, LLC v. Eterpreting, LLC*, No. 16-3634, 2016 WL 7156396, at *3 n.2 (E.D. Pa. Dec. 8, 2016) (noting that "[t]here is some confusion as to whether the Pennsylvania Supreme Court [in *Thompson*] adopted Section 766B of the Restatement (Second) of Torts").

[10] On several occasions, the Pennsylvania Superior Court has opined that section 766B is the law of Pennsylvania. *See Ciampa v. Conversion Sciences, Inc.*, Nos. 2752 EDA 2014, 2771 EDA 2014, and 2778 EDA 2014, 2015 WL 8196712, at *16 (Pa. Super. Ct. Dec. 8, 2015) (stating that Pennsylvania Supreme Court has adopted section 766B); *Int'l Diamond Imp., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274-75 (Pa. Super. Ct. 2012) (same); *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 100 n.6 (Pa. Super. Ct. 2009) ("Pennsylvania recognizes the tort of tortious interference with prospective contractual relationships, as defined by Restatement (Second) of Torts § 766B (1979)."). *But see Salsgiver Commc'n, Inc. v. Consol. Commc'n*, 150 A.3d 957, 965 n.8 (Pa. Super. Ct. 2016) ("The Pennsylvania Supreme Court has not explicitly adopted Section766B of the Second Restatement.").

tort in line with Restatement (First) § 766, but stating that Pennsylvania has adopted Restatement (Second) of Torts § 766B.

Relying on the Third Circuit's analysis regarding section 766A, a majority of district courts in this circuit have predicted that the Pennsylvania Supreme Court would not adopt section 766B(b).[11] *See Waterfront Renaissance Assoc. v. City of Phila.*, No. 07-1045, 2008 WL 862705, at *9 (E.D. Pa. Mar. 31, 2008) (noting that Pennsylvania courts have not recognized a claim under section 766B(b)); *Cottman*, 2004 WL 739907, at *3 (same); *Brotech*, 2003 WL 22797730, at *10 (same); *Leopold Graphics*, 2002 WL 1397449, at *5 (same); *Alpern v. Cavarocchi*, No. 98-3105, 1999 WL 257695, at *13 & n.13 (E.D. Pa. Apr. 28, 1999) (noting that section 766B(b) has not been adopted in Pennsylvania and describing the applicability of this section as an "unsettled" issue of law). From our analysis of the relevant authority, we conclude that, under Pennsylvania law, a claim under section 766B(a) based on conduct directed at a third party is cognizable, but a claim under section 766B(b) based on conduct directed at the plaintiff, is not.

Based on the foregoing, an actual conflict exists between the law of Pennsylvania and the laws of New Jersey and Massachusetts to the extent that Plaintiff's claim in Count 3 is based on conduct directed at him. *See CAT Internet Servs., Inc.*, 2001 WL 8858, at *3. We further find that a true conflict exists because allowing a claim under section 766B(b) would impair the law of Pennsylvania as it presently stands, *see Gemini Physical Therapy & Rehab.*, 40 F.3d at 66, while disallowing such a claim would undermine the laws of New Jersey and Massachusetts. *See Shafir*, 727 N.E. 2d at 1144; *Nostrame*, 61 A.3d at 900-01.

---

[11] We are not aware of any Pennsylvania state court decision expressly addressing the viability of a claim under section 766B(b).

Applying Pennsylvania's choice of law framework to the facts of this case, we find that Pennsylvania has the greater interest in the application of its law to Plaintiff's claim in Count 3. Defendant Fishman's residence and office are in Pennsylvania, as is the main office of his agency, First Financial. Although Plaintiff is a resident of New Jersey and generally worked out of a New Jersey satellite office, he came to First Financial's Pennsylvania home office regularly, and the paperwork for the policies Plaintiff sold was submitted to that office. Plaintiff's business relationship with Defendants was centered in Pennsylvania, and Plaintiff did business with clients in Pennsylvania. Moreover, all of Defendants' alleged tortious conduct occurred in Pennsylvania.

In suggesting that New Jersey law may apply, Plaintiff points to the fact that he is a New Jersey resident, and he contends that the injuries he sustained as a result of Defendants' alleged conduct "all were felt by Plaintiff in New Jersey, not Pennsylvania."[12] (Pl.'s Opp. Br. 29.) In the context of this case, however, the location of Plaintiff's residence has less relative importance than the other factors discussed above. Moreover, Plaintiff's place of business was arguably Pennsylvania or, at a minimum, all three states that comprised Defendants' territory. *See CAT Internet Servs.*, 2001 WL 8858, at *4 (noting that where the alleged injury is damage to plaintiff's prospective business relationships, "the plaintiff's principal place of business is generally considered the place of injury and represents a contact of substantial significance") (citations omitted); Restatement (Second) of Conflict of Laws § 145 cmt. i ("[I]f the interest is a business or financial one, such as in the case of . . . interference with contractual relations . . . the

_____

[12] Plaintiff also contends that Massachusetts law may apply because: (1) MassMutual's home office is in Massachusetts; (2) the Career Contract was on MassMutual letterhead; and (3) some of Defendants' actions with respect to Plaintiff's business were directed to MassMutual and its employees. We disagree. MassMutual is not a defendant in this action and does not have an express contractual relationship with Plaintiff. Moreover, Plaintiff's relationship with Defendants was not centered in Massachusetts, and he did not sell MassMutual policies to clients in Massachusetts.

place of business is the more important contact.").  Accordingly, applying Pennsylvania law,

Plaintiff's claim in Count 3 can withstand summary judgment only to the extent that it is based

on interfering conduct directed at a third party.

Having concluded that Pennsylvania law governs Plaintiff's claim in Count 3, we address

the merits of Defendants' arguments.  First, Defendants contend that Plaintiff's claim is deficient

because he is not a party to the insurance policies issued to his clients by MassMutual and, thus,

"it is unclear as to what prospective contractual relationship Plaintiffs avers to have been

interfered with."  (Defs.' SJ Br. 23.)  We disagree and are satisfied that Plaintiff's relationships

with his clients and MassMutual qualify as the kind of relations this tort is intended to protect

from interference.  In contrast to a claim for tortious interference with an existing contract,

Plaintiff's claim for interference with prospective contractual relations does not require that he

be a party to an explicit agreement with a third person.  Instead, a plaintiff may prevail in this

cause of action if he can prove that either a contractual or economic relationship has some

likelihood of occurring but for the defendants' interference.  *Compare Acumed LLC v. Advanced*

*Surgical Serv., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009) (applying Pennsylvania law and requiring

the existence of a "prospective contractual or economic relationship"), *with Printing Mart-*

*Morristown*, 563 A.2d at 37 (requiring a "a prospective economic or contractual relationship"),

and *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 815 N.E.2d 241, 244 (Mass.

App. Ct. 2004) (requiring "a business relationship from which the plaintiff might benefit") .

The comments to Restatement (Second) § 766B are instructive and describe the types of

relations intended to be protected:

> The relations protected against intentional interference by the rule stated in this
> Section include any prospective contractual relations, except those leading to
> contracts to marry (see § 698), <u>if the potential contract would be of pecuniary</u>
> <u>value to the plaintiff.</u> Included are interferences with the prospect of obtaining

employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts.

* * *

<u>The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights</u> or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement (Second) § 766B comment c (emphasis added). The Pennsylvania Supreme Court, and other courts applying Pennsylvania law, analzye the scope of "prospective contractual relations" in accordance with the principles articulated in this commentary. *See Glenn*, 272 A.2d at 898-99 and n.6 (finding that real estate broker anticipating commission from vendor sufficiently alleged a prospective contractual relation with a third party) (quoting *Myers v. Arcadio, Inc.*, 180 A.2d 329, 331 (N.J. Super. 1962); *see also Ciampa,*2015 WL 8196712, at *16 (quoting section 766B comment c); *Int'l Diamond Imp., Ltd.*, 40 A.3d at 1274-75 (same); *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 487 (E.D. Pa. 2010) (quoting section 766B comment c and stating that this tort covers "only relations of pecuniary value"); *Rossi v. Schlarbaum*, 600 F. Supp. 2d 650, 660 (E.D. Pa. 2009) (quoting section 766B comment c); *Smith v. Hilltown Twp.*, No. 88-2615, 1988 WL 91156, at *10 (E.D. Pa. Aug. 29, 1988) (same); *Malewicz v. Michael Baker Corp.*, No. 1741 Dec. Term 2002, 2003 WL 21982956, at *5 (Phila. Ct. Com. Pl. Aug. 6, 2003) (same); *Uber v. Exxon Corp.*, 31 Pa. D. & C. 3d 339, 340-41 (Cumberland Cty. Ct. Com. Pl. 1983) ("The contractual relation need not stem from a formal contract; it is sufficient to aver interference with a continuing business relationship.").[13]

_____

[13] On this issue, the result would be the same under New Jersey and Massachusetts law. *See, e.g.*, *Printing Mart-Morristown*, 563 A.2d at 37 (holding that although a prospective relationship "need not equate with . . . an enforceable contract," the plaintiff must allege a "'reasonable expectation of economic advantage'" (quoting *Harris v. Perl*, 197 A.2d 359, 363 (N.J. 1964))); *Chemawa Country Golf, Inc. v. Wnuk*, 402 N.E. 2d 1069, 1072 (Mass. App. Ct.

Here, the record reflects that, even in the absence of formal contracts, Plaintiff had ongoing and prospective business relationships with his clients and MassMutual by virtue of which he reasonably expected pecuniary benefits in the form of the commissions and incentive compensation he earned by selling MassMutual insurance policies and policy renewals to his clients. Indeed, the undisputed evidence establishes that at the time this dispute arose, Plaintiff had been a MassMutual agent for almost 30 years, had approximately 3,500 clients, and was one of that company's top agents. Accordingly, Plaintiff's evidence is not deficient in this regard.

Second, Defendants contend that Plaintiff cannot establish that they engaged in any interfering conduct directed at third parties. According to Defendants, "there is no evidence that Fishman . . . undertook any purposeful action to induce a potential MassMutual customer to not purchase a MassMutual insurance policy." (Defs.' SJ Br. 23.) Defendants' argument misconstrues the evidence. Viewing the evidence in the light most favorable to Plaintiff, it shows that Defendants took several actions directed at Plaintiff's clients or MassMutual that could cause them to cease or reduce their business dealings with Plaintiff and, instead deal with First Financial's agents. Without repeating in detail the factual background set forth above, Defendants' actions include: (1) falsely telling Plaintiff's clients that he was no longer with the company: (2) causing MassMutual to suspend Plaintiff's access to the electronic files necessary for his business; (3) causing MassMutual to delay the transfer of Plaintiff's book of business; and, (4) causing MassMutual to remove Plaintiff as the writing and servicing agent or servicing agent on numerous policies, with the result that, in some instances, Plaintiff would lose commissions, and communications from MassMutual to Plaintiff's clients would no longer identify him as the agent assigned to their policies. From this evidence, a factfinder could

1980) ("It is not necessary that the prospective relation be expected to be reduced to a formal binding contract.").

reasonably conclude that Defendants' actions constituted improper interference with Plaintiff's prospective contractual relations as described in Restatement (Second) of Torts § 766B(a). Accordingly, summary judgment will be denied as to Count 3.

### C.      Unfair Competition

In Count 8 of his Complaint, Plaintiff asserts a claim for common law unfair competition, alleging, *inter alia*, that Defendants' wrongful conduct detailed above resulted in the misappropriation of Plaintiff's book of business and confusion among Plaintiff's clients. Pennsylvania courts "have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (U.S.A.) v. Globus Med., Inc.*, No. 14-125, 2007 WL 2043184, *8-9 (E.D. Pa. July 12, 2007) (citations omitted).

Because summary judgment is not appropriate as to Plaintiff's claim for tortious interference with prospective contractual relations, it will also be denied as to his unfair competition claim. *See PNC Mortg. v. Superior Mortg. Corp.*, No. , 2012 WL 6280000, at *27-29 (E.D. Pa. Feb. 27, 2012) (denying summary judgment as to claims of unfair competition and tortious interference with contract where similar disputed issues of fact existed as to both claims).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

An appropriate Order will follow.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**